Alex M. Massabni v. Commissioner. Hazel Massabni v. Commissioner. Alex M. Massabni and Hazel Massabni v. Commissioner.
Massabni v. Comm'r
Docket Nos. 64171-64173. United States Tax Court
T.C. Memo 1959-62; 1959 Tax Ct. Memo LEXIS 184; 18 T.C.M. (CCH) 325; T.C.M. (RIA) 59062; March 31, 1959
*184 Walter L. Leong, Esq. 530 W. 6th Street, Los Angeles, Calif., for the petitioners. Eugene Reardon, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined the following deficiencies in income tax: Alex M. Massabni and Hazel Massabni
Year
Deficiency
1948
$2,012.52
1950
3,097.70
1951
696.34
Alex Massabni
1953
$ 70.47
Hazel Massabni
1953
$ 203.67
The sole issue is whether certain real property sold by petitioners during the taxable years was held by them primarily for sale to customers in the ordinary course of trade or business. Findings of Fact Most of the facts have been stipulated, and the stipulated facts are incorporated herein as part of our findings. Petitioners, husband and wife, filed joint income tax returns for 1948, 1950 and 1951 with the then collector of internal revenue at Los Angeles, California. For the year 1953 petitioners filed separate returns with the district director of internal revenue at Los Angeles, California. During the taxable years Alex M. Massabni was engaged in the imported lingerie business in New York City. The business was operated under *185 the name of L'Elegance Lingerie Company. He realized some income from this business in 1948, but in the other taxable years the business was unprofitable and he received no income from it. The petitioners purchased a residence in Beverly Hills, California (hereinafter referred to as the "Beverly Hills house") on June 3, 1946, for $92,531 and lived there until the sale thereof for $103,328.27 on December 8, 1948. During the years 1949, 1950 and 1951 the petitioners resided in Tarzana, California. During the year 1953 the petitioners resided in Sherman Oaks, California. Sherman Oaks is approximately six miles east of Tarzana. Tarzana is an unincorporated section of the City of Los Angeles located in the San Fernando Valley. The San Fernando Valley is bounded on the south by the Santa Monica mountains. It is a flat desert-like area which for many years has been a productive agricultural area. Because of its year-round warm tropical daytime climate and cool nights, the San Fernando Valley has become a favored residential area. Tarzana lies at the northern base of the Santa Monica mountains and at the southern end of the San Fernando Valley. The entire San Fernando Valley area (including *186 Tarzana) experienced a "tremendous" population and economic growth that commenced approximately at the conclusion of World War II. This population and economic "boom" reached its peak years during the period from 1948 to 1952. The growth and development of the San Fernando Valley (including Tarzana) in terms of residential and commercial building has been "phenomenal" in the period since the end of World War II. Ventura Boulevard is the main east-west thoroughfare through the southern end of the San Fernando Valley. Ventura Boulevard roughly follows the contour of the Santa Monica mountains. In 1941 Alex M. Massabni purchased 20 acres in one parcel in Tarzana. The approximate boundaries of this parcel (hereinafter referred to as the "original land") were as follows: on the north side by Ventura Boulevard, on the west side by Topeka Drive, on the south side by Linnet Street, and on the east side by a line approximately 150 feet east of what is now Wilbur Avenue. Ventura Boulevard, Topeka Drive, and Linnet Street were in existence before 1941. At the time of purchase walnut groves and orange trees covered much of the original land, and there was a two-story English-style ranch house *187 (hereinafter referred to as the "Tarzana house") on the northwest section of this property. During 1941 and 1942 the petitioners spent approximately $20,000 on the improvement of the Tarzana house as a residence. One of the improvements consisted of a fence around the house that enclosed approximately three acres. Petitioners resided in the Tarzana house from late in 1941 until the purchase of the Beverly Hills house on June 3, 1946. Petitioners' intention when they purchased the original land was to use it as a commercial ranch. Over a period of three or four years they increased the annual income from the sale of walnuts from about $800 to $5,200 by irrigation and fertilization. The drainage of water and rainfall from the original land was poor. The City of Los Angeles (hereinafter referred to as the "City") was desirous of correcting this condition by obtaining a 60-foot strip of land for the purpose of creating a drainage run-off from the higher level of land to the lower level of Ventura Boulevard. Early in 1946 the City informed petitioners that if necessary it would institute condemnation proceedings to obtain the desired strip. On February 12, 1946 petitioners deeded the *188 strip to the City for compensation. The strip extended from Ventura Boulevard to Linnett Street and divided the original land into two parcels, one 500 ft. by 1,350 feet and the other 150 ft. by 1,350 feet. Within a year after obtaining the strip the City graded and surfaced it into a drainage street, with two large culverts to accommodate the water drainage, and it was named Wilbur Avenue. As a result the underground irrigation system of the original land was ruined and petitioners ceased to engage in the walnut growing business. Petitioners then attempted to dispose of the ranch as a whole by placing signs on the two parcels of the original land, but were not successful. In the latter part of 1946, they decided to subdivide the remaining original land so that certain portions of it might be sold for residential use and the remaining portions rented or sold for commercial use. In California the land subdivision laws require the recording of a tract map before parcels may be sold individually. Petitioners filed such a map and other data required to obtain permission to sell parts of the ranch. Normally such permission could be obtained in five or six months, but it took petitioners *189 two years to obtain it because Alex M. Massabni was in New York City. Petitioners' plan, as approved by the City, subdivided the remaining original land into 40 lots. Lot 1, upon which the Tarzana house was located, was zoned for parking, lots 2 to 14 were zoned for commercial use, and lots 15 to 40 inclusive were zoned for residential use. Petitioners knew that bringing utilities services to the residential-zoned lots would enhance the salability of the lots. To this end the petitioners in 1947 granted easements over the original land for electric, water and gas lines to the companies providing such utilities for the purpose of extending such services into the land zoned for residential use. These lines have been extended across petitioners' property. In order to obtain the commercial zoning for lots 2 to 14 petitioners had to dedicate an area adjacent to these lots to be used as an alley and to construct this alley. In 1948 in order to guarantee the construction of the alley by the petitioners the City required them to post a bond for the amount of the construction. Petitioners intended to delay construction of the alley as long as possible and obtained a delay of performance *190 under the bond. In 1951 they learned that the City would not grant any further time extension under the bond arrangement, and during that year they paved the alley at a cost of $20,000. Petitioners also constructed a sewer that connected to a City sewer at the intersection of Ventura Boulevard and Wilbur Avenue and ran south to the alley and then west to Topeka Drive where it ended. Later the City constructed a sewer the entire length of Wilbur Avenue which connected with the sewer constructed by petitioners. Another City requirement for commercial zoning was the installation of a sidewalk along Ventura Boulevard. Petitioners installed the sidewalk on Ventura Boulevard in 1951. After the sale of the Beverly Hills House on December 8, 1948, petitioners lived in the Tarzana house. Early in 1952 they ceased to reside in the Tarzana house and moved it from lot 1 to lot 13. At an approximate cost of $38,000 the building was renovated, improved and converted to a professional building with various suites available for rental. The lots zoned for residential purposes (15 to 40 inclusive) are "ideal" residential lots because of their location. In 1948 and 1949 many persons driving along *191 Ventura Boulevard saw Wilbur Avenue being paved. From 1948 to 1953 they saw various homes being built on the original land, the sewers being installed, and the alley being paved. Because of the extremely favorable market for residential home sites and the extensive traffic past the original land, no advertising or sales activity was necessary to make the number of sales consummated during the years 1948 to 1953 inclusive. Petitioners did no excavation or grading. They did no advertising respecting the lots except on one or two occasions when they advertised the original land for sale for cash in the newspapers. Offers resulting from such advertisements were not acceptable to petitioners because they were not on cash terms. They did not hold any real estate license. All transactions were initiated by the buyers, either through observing the activity of individuals who were building their own homes or from hearing of this activity from friends of buyers. In selling residential lots, petitioners required purchasers to pay the full purchase price in cash. During the taxable years, Frank Brazelton, a licensed real estate broker, had a real estate office on the southeast corner of Ventura *192 Boulevard and Topeka Drive. He had been a friend of petitioners since 1941. Beginning in 1947 and continuing through 1953, Brazelton was employed by petitioners on a commission basis to sell the lots that were zoned for residential use. He handled the sale of these lots and petitioners referred any inquiries they received to him. They paid Brazelton a 5 per cent commission on each sale. They did not build any residences on the lots sold. Each individual who purchased a lot arranged with a building contractor of his choice to build a residence thereon. The following table shows the number of lots sold by the petitioners from the original land and the cost price, sales price and profit thereon for each of the years 1948 to 1953: No. of
Lots
Cost
Sales
Year
Sold
Price
Price
Profit
1948
8
$12,114.58
$28,418.70
$16,304.12
1949
3
4,373.25
10,011.19
5,637.94
1950
10
17,492.60
39,954.27
22,461.67
1951
2 *
$ 1,263.38
$12,500.00
$11,236.62
1952
No Sales
1953
1
1,736.94
4,800.00
3,063.06 **
*193 All of the lots sold were zoned for residential use, and all lots zoned for such use have been sold. The petitioners still own lots 2 through 14 and the southernmost two-thirds of lot 1, and are holding such lots for sale or rental for commercial purposes. During the taxable years income realized by petitioners from sources other than the sale of lots was as follows: Profit
Capital
Gains
on Sale
- Sale of
Beverly
L'Elegance
Other Land
Rental
Net Profit
on
Year
Hills Home
Company
in Tarzana
Dividends
Income
Stock Sales
1948
$10,797.27
$1,183.47
$7,846.18
$ 1,616.20
1950
$10,675.00
$28,577.21
1951 *
17,375.00
1953
6,350.00
12,443.48
In their income tax returns for the years 1948, 1950, 1951 and 1953 petitioners reported the profit realized on sales of lots as capital gain. The respondent determined that this profit constituted ordinary income from the sale of property held by them primarily for sale to customers in the ordinary course of trade or business. *194 The lots sold by petitioners were not held by them primarily for sale to customers in the ordinary course of trade or business. Opinion RAUM, Judge: Whether real estate is held by a taxpayer primarily for sale to customers in the ordinary course of trade or business is essentially a question of fact. Certain factors have been recognized by this and other courts to be helpful guides in reaching the correct result. They have been mentioned in numerous cases and need not be restated. See (C.A. 9), certiorari denied, ; (C.A. 10); (C.A. 5). Each case must be decided on its own peculiar facts. The record discloses that petitioners bought the 20-acre tract in 1941 with the intention of operating a walnut-growing ranch thereon. For several years thereafter, by irrigation and fertilization of the land, they increased their income from the sale of walnuts. In 1946 their plans were altered when the City of Los Angeles acquired a strip of the land for drainage purposes. Because this drainage *195 strip adversely affected the use of the land for the purpose for which it was acquired, petitioners decided to sell it. When efforts to sell the two sections of the land divided by the drainage strip were not successful, they received permission from the city to subdivide them into lots, some of which were zoned from residential use and others for commercial use. The lots sold during the years 1948 through 1953 were those zoned for residential purposes. Petitioners did no excavation or grading on these lots and whatever work was done does not appear to have been in excess of what was required to sell these lots. [1]
The case is a close one, and various factors present here have doubtless been among the considerations which, in other cases, have induced us to find that the taxpayer was conducting a real estate business. However, taking the whole record into account it is our best judgment and we so find that the petitioners herein were not holding the lots primarily for sale to customers in the ordinary course of a trade or business. Decisions will be entered *196 for the petitioners. Footnotes
*. Portions of Lots 1 and 35 were sold in one sale. ↩
**. One-half reported by each petitioner in separate returns filed for 1953.↩
*. Petitioners also had interest income in the amount of $27.82 in 1951.↩
1. Indeed, virtually all of the improvements made seem to pertain to the commercial lots, which are not here involved.↩